# In the United States Court of Federal Claims

HEALTHREV, LLC,

                *Plaintiff,*

v.

THE UNITED STATES,

                *Defendant,*

and

ANSIBLE GOVERNMENT SOLUTIONS, LLC,

                *Defendant-Intervenor.*

No. 24-0352
(Filed: June 13, 2024)[1]

*Merle DeLancey, Jr.*, Blank Rome LLP, Washington, DC, for Plaintiff.

*Liridona Sinani*, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

*John Prairie*, Wiley Rein LLP, Washington, DC, for Defendant-Intervenor.

## OPINION AND ORDER

**LERNER,** *Judge*.

    Plaintiff HealthRev, LLC ("HealthRev"), a Mentor-Protégé Joint Venture ("MPJV") between protégé eRevs Supply Chain ("eRevs") and mentor DLH Solutions, Inc. ("DLH"), brings this bid protest against the United States. Compl., ECF No. 1. The solicitation at issue involves a contract for pharmacist, pharmacist-technician, and shipper/packer services for the Department of Veterans Affairs' ("VA") pharmacy system. HealthRev claims that the VA improperly evaluated its proposal by 1) using the same evaluation standards as those used when evaluating other non-MPJV offerors in violation of 13 C.F.R. § 125.8(e); and 2) unreasonably applying unstated evaluation criteria and subjecting Plaintiff to disparate treatment.

---

[1]    The Opinion was filed on June 4, 2024, and the parties were afforded fourteen days to propose redactions. Opinion & Order, ECF No. 40. The parties jointly proposed redactions. ECF No. 42. Accordingly, the Court reissues this Opinion with the agreed-upon redactions, which are noted with bracketed asterisks.

Pending before this Court are the parties' cross-motions for Judgment on the Administrative Record.  Pl.'s Mot. for J. on the Admin. R. ("Pl.'s Mot."), ECF No. 28; Def.'s Cross-Mot. for J. on the Admin. R. ("Def.'s Mot."), ECF No. 33; Def.-Intervenor's Cross-Mot. for J. on the Admin. R. ("Def.-Intervenor's Mot."), ECF No. 32.  For the reasons below, Plaintiff's Motion for Judgment on the Administrative Record is **DENIED**.  Defendant and Defendant-Intervenor's Cross-Motions for Judgment on the Administrative Record are **GRANTED**.

## I.    Factual Findings

### A.    The Solicitation and Subsequent Amendments

The VA operates seven Consolidated Mail Outpatient Pharmacy ("CMOP") facilities nationwide, including a facility in Chelmsford, Massachusetts that distributes around 250,000 prescriptions per week.  AR 14, 167.  Plaintiff HealthRev is a service-disabled veteran-owned small business MPJV.  AR 1754.  The protégé firm is eRevs, and the mentor firm is DLH.  *Id.* DLH is the incumbent contractor for all seven CMOP facilities.  AR 1809, 1265.  Since 1999, it serviced the CMOP program in various capacities.  AR 1754.

In November 2022, the VA issued a solicitation for a 100% set aside for Service-Disabled Veteran-Owned Small Businesses ("SDVOSBs").  AR 2279.  The procurement called for pharmacist, pharmacy technician, and shipper/packer services to support the Chelmsford CMOP ("Solicitation").  *Id.*  The awardee would furnish and manage the CMOP's pharmacists, pharmacy technicians, and shipper/packers, as well as provide administrative support such as scheduling, payroll, onboarding, and time/attendance matters.  AR 171, 2307.  The contract scope was to provide ninety-one full-time employee equivalents per day—totaling six pharmacists, twenty-nine pharmacy technicians, and fifty-six shipper/packers.  AR 2307.

### B.    Evaluation Criteria

The Solicitation specified that the successful proposal would be the "most advantageous to the Government, price and other factors considered."  AR 158.  The three evaluation factors were: 1) Technical Capability; 2) Past Performance; and 3) Price.  *Id.*  Technical Capability and Past Performance were equally weighted, but when combined were significantly more important than Price.  AR 277–78.

Under Technical Capability, the Solicitation applied three subfactors: A) Experience; B) Program Management; and C) Transition Plan.  AR 158–59; *see also* Table 1.  For Past Performance, the VA considered information submitted by the offeror plus other sources available to the Government (e.g., Government databases, personal business experience with the offeror).  AR 159, 278.  Past performance projects were evaluated based on size and scope, assessing "the relative risks associated with an Offeror's likelihood of success in performing the solicitation's requirements."  AR 85, 469.  Recent services were considered only if performed within three years before the Solicitation's release.  AR 469.  For Price, the VA applied the standards for reasonableness set forth in FAR 15.404-1(b).  AR 279.  Finally, under the Past Performance factor, the VA assigned an "overall confidence rating" to each proposal "based on

the Government's expectation the Offeror will successfully accomplish the current
requirements." AR 159.

*Table 1.*

| Technical Capability Subfactor | Description |
|---|---|
| **Subfactor A: Experience** | The Government will evaluate this subfactor to determine the extent the offeror's proposed team has demonstrated experience in placing pharmacists and pharmacy technicians at levels called for in the current requirement. Additional consideration will be given to experience that is from the offeror's direct organization (i.e. not via subcontractor or teaming partner). The Government will further evaluate this subfactor to determine the extent the offeror has demonstrated the ability to successfully credential, background, and on-board a large number of contract personnel. Significant consideration will be given to offerors who demonstrate experience with VA's unique processes. |
| **Subfactor B: Program Management** | The Government will evaluate this subfactor to determine the extent the proposed work methods are sufficient to meet the requirements of the PWS. Offerors who demonstrate more robust timekeeping, records management processes, and quality control programs will be rated more favorably. In addition, additional consideration will be given to offerors that can demonstrate the Facility Administrator is currently on staff and currently available for the project. |
| **Subfactor C: Transition Plan** | The Government will evaluate this subfactor to determine the extent the offeror has demonstrated the ability to successfully transition and meet the full performance standards required by the PWS. |

AR 158–59.

The rating system was based on adjectival and narrative metrics. AR 463. The agency
used adjectives such as outstanding, good, acceptable, marginal, and unacceptable to indicate the
degree to which the proposal met each factor's standards. AR 463–64.; *see* Table 2. For this
procurement, the VA used adjectival ratings supported by narrative statements to evaluate the
proposals. AR 463. The agency was also required to use narrative statements when applying
evaluation standards and conducting a cost/technical tradeoff. *Id.*

*Table 2.*

| ADJECTIVAL | DEFINITION |
|---|---|
| Outstanding | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low. |
| Good | Proposal meets requirements and indicates a thorough approach and understanding of the requirements. Proposal contains strengths which outweigh any weaknesses. Risk of unsuccessful performance is low. |
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements. Strengths and weaknesses are offsetting or will have little or no impact on contract performance. Risk of unsuccessful performance is no worse than moderate. |
| Marginal | Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements. The proposal has one or more weaknesses which are not offset by strengths. Risk of unsuccessful performance is high. |
| Unacceptable | Proposal does not meet requirements and contains one or more deficiencies. Proposal is not awardable. |

AR 464.

### C.    The VA's Award Decision and HealthRev's Debriefing

In October 2023, the VA narrowed the pool of offerors to a competitive range of eight, conducted discussions with these offerors, and allowed them to submit revised final proposals. AR 1298.  After evaluating the final proposals, the VA awarded the contract to Ansible Government Solutions, LLC ("Ansible") in February 2024.  AR 2340, 2476; *see also* Table 3 (listing the final evaluation scores and total evaluated price for the seven offerors).  On February 26, 2024, HealthRev requested a debriefing from the VA, and a day later, it submitted additional questions.  AR 2584–2599.  The agency debriefed HealthRev on February 29, 2024.  AR 2600–09.

*Table 3.*

| Offeror | Technical Subfactor A | Technical Subfactor B | Technical Subfactor C | Overall Technical Score | Past Performance | Price |
|---|---|---|---|---|---|---|
| Ansible | Outstanding | Good | Outstanding | Outstanding | Substantial Confidence | $51,877,016.70 |
| [***] | Good | Good | Good | Good | Substantial Confidence | [***] |
| [***] | Good | Good | Good | Good | Substantial Confidence | [***] |
| [***] | Good | Good | Good | Good | Satisfactory Confidence | [***] |
| HealthRev | Good | Good | Acceptable | Good | Satisfactory Confidence | [***] |
| [***] | Good | Good | Acceptable | Good | Low Confidence | [***] |
| [***] | Good | Unacceptable | Outstanding | Unacceptable | N/A | [***] |

AR 2339.

## II.      Procedural History

On March 5, 2024, HealthRev filed a Complaint challenging the award.  Compl.  The Court granted Ansible's Motion to Intervene on March 6, 2024.  Order, ECF No. 10.  On April 4, 2024, the Court granted Plaintiff's unopposed Motion to Complete the Administrative Record. Pl.'s Mot. to Complete the Admin. R., ECF No. 26.  HealthRev moved for judgment on the administrative record on April 10, 2024.  Pl.'s Mot.  The Government and Defendant-Intervenor responded fifteen days later and cross-moved for judgment on the administrative record.  Def.'s Mot.; Def-Intervenor's Mot.  Plaintiff replied on May 2, 2024, and the defendants filed responses a week later.  Pl.'s Reply, ECF No. 34; Def.'s Reply, ECF No. 35; Def.-Intervenor's Reply, ECF No. 36.

## III.      Standard of Review and Jurisdiction

The Court of Federal Claims has jurisdiction over protests by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract . . . or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  The Court may set aside an agency action, such as a proposal evaluation, "if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (citations omitted).

The contracting agency acted rationally if it "provided a coherent and reasonable explanation of its exercise of discretion."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (citations omitted).  Additionally, "an

offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably." *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 384 (2003), *aff'd*, 365 F.3d 1345 (citations omitted).

Notably, "[a]n agency's award decision is 'least vulnerable to challenge when based upon a best value determination.'" *Garrett Elecs., Inc. v. United States*, 163 Fed. Cl. 632, 672 (2023) (citations omitted). "Procurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *see also Cleveland Assets, LLC v. United States*, 883 F.3d 1378, 1382 (Fed. Cir. 2018); *Banknote Corp.*, 365 F.3d at 1355.

This case proceeds on cross-motions for judgment on the administrative record. The Court must "make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354 (Fed. Cir. 2005). "Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record." *Sierra Nevada Corp. v. United States*, 107 Fed. Cl. 735, 751 (2012).

## IV.    Discussion

Plaintiff challenges the VA's evaluation on the two non-price factors: Technical Capability and Past Performance. Pl.'s Mot. at 5. According to HealthRev, its proposal was improperly assessed under these factors because the VA either 1) violated 13 C.F.R. § 125.8(e); 2) relied on factual assumptions contradicted by the record; 3) applied unstated evaluation criteria; or 4) subjected HealthRev to disparate treatment. HealthRev fails on each of these grounds.

### A.    The VA's Evaluation Did Not Violate 13 C.F.R. § 125.8(e).

13 C.F.R § 125.8(e) governs joint venture offerors participating in government procurements, including MPJVs such as HealthRev. Section 125.8(e) states:

> When evaluating the capabilities, past performance, experience, business systems and certifications of an entity submitting an offer for a contract set aside or reserved for small business as a joint venture established pursuant to this section, a procuring activity must consider work done and qualifications held individually by each partner to the joint venture as well as any work done by the joint venture itself previously. A procuring activity may not require the protégé firm to *individually* meet the same evaluation or responsibility criteria as that required of other offerors generally. The partners to the joint venture *in the aggregate* must demonstrate the past performance, experience, business systems and certifications necessary to perform the contract.

13 C.F.R. § 125.8(e) (emphasis added). According to Plaintiff, the VA erred by requiring eRevs—the protégé firm—to individually meet the same evaluation criteria as other offerors and failing to assess the MPJV "in the aggregate." Pl.'s Mot. at 10–11. Plaintiff claims that the Government "misuses" the phrase "in the aggregate" in the last sentence of the regulation and improperly equates the term to mean "average." Pl.'s Reply at 3.

6

To determine whether the agency's conduct violated § 125.8(e), the Court begins with the plain language of the regulation and considers the terms according to their common meaning. *Hanser v. McDonough*, 56 F.4th 967, 970 (Fed. Cir. 2022).  The Court must assess "a [regulatory] scheme in its entirety" and "give full effect to all words contained within [a] statute or regulation, thereby rendering superfluous as little of the statutory or regulatory language as possible." *Id*. (internal quotations omitted).  "If the regulatory language is clear and unambiguous, the inquiry ends with the plain meaning." *Goodman v. Shulkin*, 870 F.3d 1383, 1386 (Fed. Cir. 2017).

The dictionary definition of the phrase "in the aggregate" means "considered as a whole." *In the aggregate*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/in%20the%20aggregate (last visited May 7, 2024).  The verb "to aggregate" means "to collect or gather into a mass or whole" or "to amount to (a whole sum or total)." *Aggregate*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/aggregate (last visited May 7, 2024).  Reading the last sentence of § 125.8(e) in context, the agency must evaluate the qualifications of the mentor, protégé, and the MPJV to determine whether, as a whole, the joint venture can successfully perform the contract.  The agency may not require the protégé firm to independently meet the evaluation criteria applied to other offerors generally—because evaluating the MPJV "in the aggregate" means to allow the mentor partner's strengths to offset the protégé's limitations.

Plaintiff claims that aggregate "means considering what each partner brings to the partnership, *not* what each partner does not bring to the partnership."  Pl.'s Reply at 3.  However, HealthRev's proposed meaning conflicts with the first sentence of § 125.8(e): "a procuring activity must consider work done and qualifications held individually by *each* partner to the joint venture." 13 C.F.R. § 125.8(e) (emphasis added).  For instance, if a protégé's qualifications do not fully meet a procurement's requirements, the agency may properly consider this as a factor— as long as the protégé's weaknesses are assessed in tandem with its mentor partner's and the joint venture's overall strengths.  That said, HealthRev's definition would "render[] superfluous" the first term of § 125.8(e).  *See Hanser*, 56 F.4th at 970.

Plaintiff also distorts the plain meaning of "consider."  Merriam-Webster's Dictionary defines "consider" as "to think about carefully" and "to take into account."  *Consider*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/consider (last visited May 10, 2024).  Applied to the first sentence of the regulation, § 125.8(e) requires agencies to "take into account" each partner's individually held experiences and qualifications.  HealthRev's interpretation would require the VA to consider only eRevs' and DLH's strengths and ignore any concerns that the joint venture's contract performance may fall short.

The SBA's comments to § 125.8(e) similarly conflicts with HealthRev's position.  In implementing the regulation's latest version, the SBA noted that "[t]he reason that any small business joint ventures with another business entity, whether a mentor-protégé joint venture or a joint venture with another small business concern, is because it cannot meet all performance requirements by itself and seeks to gain experience through the help of its joint venture partner." 85 Fed. Reg. 66146, 66167 (Oct. 16, 2020).  And it is "unreasonable" for agencies to require protégé firms to exhibit the same level of past performance as their mentors.  *Id.*  That said, the protégé's shortcomings need not be ignored; an agency may require the protégé to individually meet *some* evaluation or responsibility criteria.  *Id.*  Indeed, protégés must "bring something to

7

the table other than its size or socio-economic status" such as "some experience in the type of work to be performed under the contract." *Id.* at 66167–68.  Based on § 125.8(e)'s plain language and the considerable deference afforded to agencies conducting technical and past performance evaluations, the VA's assessment did not violate § 125.8(e).  *See E.W. Bliss*, 77 F.3d at 449; *Taahut v. United States*, 849 Fed. App'x 260, 266 (Fed. Cir. 2021).

Finally, despite Plaintiff's reliance on *SH Synergy, LLC v. United States*, 165 Fed. Cl. 745 (2023), the facts in that case are inapplicable.  Pl.'s Mot. at 5; Pl.'s Reply at 4.  In *SH Synergy*, the agency used an objective "scoring table that allocate[d] points to each evaluation factor and sub-factor introduced" in the solicitation requirements.  165 Fed. Cl. at 771.  The solicitation directed the protégé to submit an individually performed and relevant experience project that was scored using this same table.  *Id.* at 768.  The court found this acceptable.  *Id.* at 769.  But applying the same scoring table (and underlying evaluation criteria) to the protégé's individually submitted project was not appropriate.  *Id.* at 775.  Here, the VA applied a different evaluation scheme, one in which DLH and eRevs pooled their qualifications and were scored in the aggregate.  *See, e.g.*, AR 2333 ("Based on an evaluation of the [five] references received [from DLH and eRevs] . . . the Government has a reasonable expectation that the offeror will successfully perform the required effort.") (discussing projects submitted by both partners before giving HealthRev a "Satisfactory Confidence" rating).  *SH Synergy*'s evaluation scheme barred the protégé from benefitting from the mentor's experience.  The solicitation here did not.

### 1.    The VA's Technical Evaluation for HealthRev Did Not Violate 13 C.F.R. § 125.8.

HealthRev contends that the VA's technical evaluation was arbitrary because the agency required eRevs to independently meet the same evaluation criteria as other offerors, and then improperly lowered HealthRev's rating under three subfactors: Experience, Program Management, and Transition.  Pl.'s Mot. at 6.  Technical ratings fall within "the minutiae of the procurement process . . . which involve discretionary determinations of procurement officials that a court will not second guess."  *E.W. Bliss Co.*, 77 F.3d at 449.  Though a court must examine whether the agency provided a "coherent and reasonable explanation of its exercise of discretion," "the deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation."  *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009); *Harmonia Holdings Grp., LLC v. United States*, 152 Fed. Cl. 97, 106-07 (2021) (quoting *CSC Gov't Sols. LLC v. United States*, 129 Fed. Cl. 416, 434 (2016)).  Here, the VA had a reasonable basis for rating HealthRev's overall technical capabilities as "Good."  AR 2339.

### a.   Experience Subfactor

The VA rated HealthRev's technical experience as "Good" based on two strengths from HealthRev's mentor-partner: 1) DLH "demonstrated specific past experience with VA's unique credentialing processes"; and 2) DLH "demonstrated direct experience in placing a large number of pharmacist and pharmacy technicians."  AR 2299 (citing [***] pharmacists, [***] pharmacy technicians and [***] shipper/packers DLH placed in the last thirty-six months at the CMOPs), *id.* (noting that DLH has about twenty-three years' experience credentialing and onboarding various CMOP personnel across seven sites).

The VA did not assign HealthRev any weaknesses or deficiencies under this subfactor. AR 2300. In fact, the VA found that eRevs neither positively or negatively impacted this factor because it was "unclear the specific responsibilities and actual [role] delineation between eRevs and DLH" at the Charleston CMOP. *Id.* For example, the agency explained that it could not discern "whether eRev [sic] actually placed employees, or if they were originally placed by DLH and transitioned to E-Rev [sic]." *Id.* HealthRev's proposal only indicated that after the transition, eRevs placed [***] more shipper/packers and pharmacy technicians. AR 2300. But in contrast to DLH, Plaintiff did not describe the [***] employees eRevs placed or "include Pharmacists at all." AR 2300. The VA found that the "information provided is still limited in nature and does not warrant a strength." *Id*.

With the information HealthRev provided, the agency could not decisively conclude that eRevs directly placed employees *beyond* the [***] specified shipper/packers and pharmacy technicians and could thus contribute experience warranting an "Outstanding" rating. *See* AR 464 (A "Good" proposal "meets requirements" and "contains strengths which outweigh any weaknesses," but an "Outstanding" proposal details an "exceptional approach."). The Solicitation required proposals to provide "sufficient detail to enable the Government to make a thorough evaluation of the contractor's technical competence and ability." AR 1390. HealthRev failed to do so. Further, the agency's choice to consider eRevs' placement of [***] employees to raise HealthRev's rating to "Outstanding" is a discretionary determination that the Court will not second guess. *E.W. Bliss Co.*, 77 F.3d at 449.

HealthRev argues that the VA improperly compared eRevs' past placement of [***] employees to the current requirement. Pl.'s Mot. at 7. But as explained above, § 125.8(e) mandates the agency to individually assess eRevs' capabilities alongside DLH and HealthRev and bars the VA from requiring eRevs to meet the requirements *alone*. The VA did not require eRevs to independently meet the Experience Subfactor requirement, as the VA gave HealthRev a "Good" rating based on DLH's individual experience. AR 2299.

It was also rational for the VA to reference the current requirement in assessing whether eRevs' experience warranted a strength for the MPJV as a whole. AR 2300, 2329. Section 125.8(e) does not mandate agencies to evaluate protégés in a vacuum, divorced from the contract specifications. Indeed, protégés must bring "some experience in the type of work to be performed under the contract." 85 Fed. Reg. 66146, 66167. Rather, the agency may consider how many and the type of employees eRevs placed, as long as it permits DLH to make up for any shortfalls—which DLH did here, by demonstrating experience placing [***] pharmacists. Thus, the VA's evaluation under the Experience subfactor did not violate § 125.8(e).

### b. Program Management Subfactor

HealthRev received a "Good" rating under the Program Management subfactor. AR 2300. To support this rating, the VA identified three strengths. *Id.* First, the agency recognized that HealthRev's proposed Facility Administrator is on staff and also oversees operations at the Chelmsford CMOP. *Id.* Second, the VA noted that HealthRev showed that its proposed timekeeping system could provide real-time data which exceeds the minimum requirements and gives more information helpful to ensuring daily requirements are met. *Id.* Lastly, the agency rewarded HealthRev for submitting a Quality Control Plan that demonstrated HealthRev's relevant certifications and included examples of its prior successful issue resolutions. *Id.*

9

The VA also assigned HealthRev one weakness that offset the three strengths.  *Id.*  The agency found that while the proposal "articulate[d] the relative responsibilities of eRevs and DLH, many of the areas in which eRevs would have 'lead' were in areas where the Proposal did not demonstrate that [eRevs] had the technical capability or expertise."  *Id.*  HealthRev claims that the agency erred by assigning a weakness based solely on eRevs' limited experience.  Pl.'s Mot. at 8.  According to Plaintiff, this diverges from § 125.8(e) because the VA required eRevs to "meet all performance requirements by itself" and "concern itself to have the same level of past performance and experience . . . as its large business mentor."  *See id.* at 9 (internal quotations omitted).

This argument fails because, again, the VA did not require eRevs to satisfy "all performance requirements by itself."  *Id.* at 9 (citing 85 Fed. Reg. 66167).  Rather, HealthRev's plan required eRevs to manage at a scale and scope beyond its experience—with limited support from DLH.  Under HealthRev's proposed Program Management plan, eRevs "leads all tasks" including [***].  AR 1762.  eRevs also leads in [***].  *Id.*  In contrast, DLH "supports [eRevs] with all tasks."  *Id.*

While Plaintiff designated eRevs as lead for these tasks, its proposal emphasized eRevs' supporting role on the Charleston CMOP.  *See, e.g.,* AR 1755 ("eRevs brings current experience operating as a subcontractor to DLH at the Charleston VA CMOP facility"), 1761 (identifying eRevs as the "managing JV partner" and referencing its role as the Charleston CMOP subcontractor as the first example of "direct, measurable, relevant, and recent experience"), 1761 ("the combined team of DLH as prime and eRevs . . . utilize[s] the . . . fresh management approach"), 1761–62 ("this firsthand experience directly managing CMOP Shipper/Packer and Pharmacy Technician PWS tasks under DLH's mentorship"), 2301 ("[A]ll the identified roles/responsibilities . . . demonstrate E-Revs [sic] is serving in [a] more limited role . . . .").  And the proposal did not clarify whether eRevs would transition into the subcontractor role after DLH performed the role.  AR 2301–02.

The agency recognized that DLH could supplement eRevs.  But it was also reasonable for the VA to assign a weakness because DLH did not have the lead or even co-lead position on the identified tasks—and HealthRev's proposal failed to show how DLH could otherwise ensure eRevs' success as a managing member.  AR 2350.  The VA did not discount DLH's management experience nor singularly focus on eRevs' lack thereof, but justifiably concluded that DLH's impact was undercut because it serves a largely subordinate role on these responsibilities.  *Id.*  Indeed, the "SBA disagrees that a procuring activity should not be able to require a protégé firm to individually meet *any* evaluation or responsibility criteria."  85 Fed. Reg. 66168 (emphasis added).  Such is the case here, where the VA expects the partner leading management tasks to show *some* experience doing just that.

HealthRev also contends that the VA disregarded eRevs' individual strength under the Program Management factor—specifically, Aretha Battle's position as HealthRev's president and eRevs' Founder and CEO.  Pl.'s Mot. at 9.  Ms. Battle previously held senior roles at the Centers for Disease Control and Prevention's Division of the Strategic National Stockpile.  AR 1755.  According to Plaintiff, this was a substantial benefit the VA overlooked and one it should have credited as another strength.  Pl.'s Mot. at 10.

Still, Plaintiff's "mere disagreement with the agency's judgment" cannot sustain a protest. *Banknote Corp.*, 56 Fed. Cl. at 384; *Gritter Francona, Inc. v. United States*, 158 Fed. Cl. 597, 608 (2022) ("The '[e]valuation of experience . . . by its very nature, is subjective and an offeror's mere disagreement with an agency's evaluation judgments does not demonstrate that those judgments are unreasonable.'" (quoting *Science & Mgmt. Res., Inc. v. United States*, 117 Fed. Cl. 54, 65–66 (2014))). As the record shows, HealthRev did not explain how Ms. Battle's experience would specifically improve the joint venture's timekeeping, records management, or quality control, especially since the proposal does not identify her as a Facility Administrator. *See* AR 171 (listing Facility Administrator as the "Key Personnel"), 278, 1775 (identifying Ms. Battle as the HealthRev president), 1756 (noting that Ms. Battle possesses qualifications that combine medical supply chain oversight expertise with medical facility operations experience and patient-focused medical professional management experience). And the agency did give HealthRev strengths for its proposed Facility Administrator. AR 2300–01.

HealthRev insists that eRevs provides "substantial benefits," which Plaintiff's proposal detailed at "great lengths." Pl.'s Mot. at 10; Pl.'s Reply at 11. But "the onus [is] on the [offeror] to 'submit a well-written proposal with adequately detailed information[.]'" *Garrett Elecs.*, 163 Fed. Cl. at 670 (quoting *KSC Boss All., LLC v. United States*, 142 Fed. Cl. 368, 382 (2019)). HealthRev did not.

### c. Transition Plan Subfactor

The agency rated HealthRev's transition plan "Acceptable" based on two strengths and two weaknesses. AR 2301–02. The plan's two strengths "demonstrated a considerable number of employees currently on staff within a 50-mile radius of Chelmsford" and "indicated [HealthRev] intended to utilize incentives for recruitment." *Id.* These strengths were mitigated by two weak points: 1) the proposal did not detail the specific incentives HealthRev planned to use to recruit and was instead focused on general incentives and retention; and 2) the proposal did not show any recent experience in transitioning contracts. AR 2302. The VA noted that DLH's transition examples were more than ten years old and had "very limited impact." *Id.* And "the Proposal did not demonstrate any transition experience from the JV itself or the managing SDVOSB member—E-Revs [sic]." *Id.*

Again, HealthRev argues that the VA downgraded its transition score because of eRevs' protégé status. As support, HealthRev cites the VA's assessment that the proposal "only articulated experience of E-Revs [sic] transitioning into a subcontractor position—under DLH—and did not demonstrate prior experience successfully transitioning to full performance on a comparable scale as the current requirement, nor any experience serving in managing or 'prime' role during transition as they would assume in the current procurement." Pl.'s Mot. at 10 (citing AR 2303). But this statement needs to be read in context with the VA's evaluation of DLH and HealthRev's transition experience.

The VA concluded that DLH's transition experience was distinguishable from the current requirement. AR 2302 (noting that DLH's examples were more than ten years old, with the more recent transitions listed "not demonstrative of transitioning from one incumbent contractor to start contract performance on the subsequent award"), 2303 ("The current situation is not DLH as incumbent moving to DLH as new awardee. Nor is it as simple as eRevs transitioning into a subcontractor role."). The agency also examined eRevs' and HealthRev's experience for

examples that would offset DLH's limitations.  AR 2303 ("[N]or did the proposal address any projects for the actual JV offeror (HealthRev) or the underlying SDVOSB firm (E-Rev [sic]).").  The record thus does not show that the VA impermissibly required eRevs to provide transition experience "on a comparable scale as the current requirement."  Pl.'s Mot. at 10.  Rather, because DLH's and HealthRev's transition examples were lacking, the VA assessed whether eRevs could meet the requirement on its own.

The MPJV program allows a protégé to benefit from its mentor's experience.  But where the mentor's experience falls short, a protégé cannot rely only on its "size or socio-economic status" to compensate for shortcomings.  *See* 85 Fed. Reg. 66168.  In sum, the VA reasonably assessed HealthRev's transition plan in accordance with § 125.8(e).

### 2.   The VA's Evaluation of HealthRev's Past Performance Did Not Violate 13 C.F.R. § 125.8.

HealthRev also argues that the VA violated § 125.8(e) in evaluating Plaintiff's past performance.  The agency weighed offerors' past performance based on information they submitted, including Past Performance Questionnaire ("PPQ") responses from references, Contractor Assessment Performance Reporting System ("CPARS") assessments, System for Award Management ("SAM") Responsibility/Qualification Record, and projects recently awarded or administered by VA Network Contracting Office ("NCO") 15.  AR 2306–08.  To qualify as recent, projects must have been either ongoing or performed within three years of the solicitation's issuance date.  AR 2306.  The VA considered the size, scope, and complexity of the projects submitted to determine the relevance.[2]  *Id.*

Under this factor, the VA gave HealthRev a "Satisfactory Confidence" rating (i.e., "the Government has a reasonable expectation that the offeror will successfully perform the required effort").  AR 2308, 2333.  HealthRev submitted five total projects: two from DLH, three from eRevs, and none from HealthRev itself.  AR 2326, 2328.  HealthRev again claims that the VA impermissibly evaluated eRevs using the same standards and criteria as all other offerors.  Pl.'s Mot. at 11.  As a result, it asserts the VA downgraded HealthRev for eRevs' onboarding/credentialing experience, the limited duration of eRevs' performance at the Charleston CMOP, and the scale of personnel whom eRevs placed.  *Id.* (citing AR 2329, 2330).

HealthRev's § 125.8(e) argument is not persuasive.  When considering challenges to an agency's past performance evaluation, the "agency's reasonable interpretation of the facts is entitled to considerable deference."  *Taahut*, 849 Fed. App'x at 266.  The record shows that the agency reviewed the references, CPARS reports, SAM Responsibility Record, and NCO 15 Files received for eRevs, DLH, and HealthRev individually—as required by § 125.8(e).  *See* AR 2326–28 (review of DLH's CPARS reports, NCO 15 files, and noting that no PPQs were submitted), 2328–31 (review of eRevs' CPARS reports, NCO 15 files, and PPQs, where available), 2333; § 125.8(e) ("When evaluating the . . . past performance . . . of . . . a joint

---

[2]     For example, a "Very Relevant" project involves "essentially the same scope and magnitude of effort and complexities."  AR 2306.  A "Relevant" project has "similar" scope, magnitude, and complexities.  *Id.*  A "Somewhat Relevant" project has "some" of these qualities; a "Not Relevant" project has "little or none."  AR 2307.

venture . . . a procuring activity must consider work done and qualifications held individually by each partner to the joint venture as well as any work done by the joint venture itself previously."). After evaluating each partner's submissions, the VA then aggregated the results. AR 2333.

The VA's past performance assessment complies with § 125.8(e) for the same reasons the VA's technical evaluation did—while DLH's past performance was "relevant in terms of size, scope, and complexity," it still contained flaws. *See, e.g.*, AR 2333 ("[DLH's] task orders . . . are not the most recent contracts for the work."), 2333 ("VA files noted persistent and ongoing issues with respect to performance which required additional Government intervention. While ultimately performance is Satisfactory, these ongoing issues preclude a *high expectation* the offeror will successfully perform[.]") (emphasis added).

The agency did not downgrade HealthRev based on critiques of eRevs' past project submissions. Rather, it evaluated whether eRevs' experience allowed HealthRev as a whole to provide "a high expectation" of success despite DLH's less than perfect showing. *Id.* ("[T]he references submitted for eRevs did not meaningfully increase the confidence of successful performance."). eRevs' past performance was too limited in size, scope, and complexity to fully offset the agency's concerns. *Id.* Again, eRevs should benefit from DLH's experience, but where its mentor falls short, eRevs cannot rely on its protégé status to make up the difference.

### B.      The VA's Evaluation Was Not Based on Contradictions in the Record.

Technical ratings fall within "the minutiae of the procurement process . . . which involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co.*, 77 F.3d at 449. That said, "when [agency] determinations are contradicted by the record, no amount of deference can save them from being overturned as arbitrary and an abuse of discretion." *DZSP 21, LLC v. United States*, 139 Fed. Cl. 110, 118 n.9 (2018) (citing *Mendoza v. Merit Sys. Prot. Bd.*, 949 F.2d 391, 393-94 (Fed. Cir. 1991) (finding that an agency's statement that appellant submitted no explanation for delayed filing of her appeal was contradicted by record)). No such contradiction exists here.

Plaintiff claims that the VA's technical evaluation was factually incorrect and inconsistent with the record. Pl.'s Mot. at 12. The VA concluded that "it [was] unclear [what] the specific responsibilities and the actual delineation between E-Revs [sic] and DLH [are]." AR 2300. But according to HealthRev, its proposal "dispels all doubt that eRevs possesses direct, firsthand, experience in all the steps necessary to place all types of personnel employed at a VA CMOP." Pl.'s Mot at 13.

The facts do not support HealthRev's argument. For example, Plaintiff claims the proposal shows eRevs' direct experience placing *pharmacists*. Pl.'s Mot. at 13 (citing AR 1771). However, the page HealthRev cites in its proposal states only that eRevs directly placed "30 Shipper/Packers and Pharmacy Technicians." AR 1771. Plaintiff does not articulate how many of the thirty placements were shipper/packers versus pharmacy technicians. *Id.* By contrast, according to the record, DLH placed "[***] Pharmacists, [***] Pharmacy Technicians, and [***] Shipper/Packers" within the prior thirty-six months of the CMOP contract. AR 1763–64. Again, the agency rationally concluded that eRevs' experience here did not warrant a strength or weakness. *Supra* Section IV(A)(1)(a). Because the Court can reasonably discern the VA's

13

decisional path from the record, it declines to disturb the agency's conclusions on this point. *Cf. Garrett Elecs. Inc.*, 163 Fed. Cl. at 658.

### C.      The VA Did Not Apply Unstated Evaluation Criteria.

To succeed on a claim for unstated evaluation criteria, HealthRev must show that "(i) the procuring agency used a significantly different basis in evaluating the proposals than was disclosed; and (ii) the protester was prejudiced as a result—that it had a substantial chance to receive the contract award but for that error." *Banknote Corp. of Am.*, 56 Fed. Cl. at 387; *Golden IT, LLC v. United States*, 165 Fed. Cl. 676, 686–87 (2023). The agency may not rely on unstated evaluation criteria in considering proposals and, where appropriate, must disclose each factor's relative importance. *Banknote Corp.*, 56 Fed. Cl. at 386 ("It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation."). Even so, the agency need not identify evaluation elements "intrinsic to the stated [evaluation] factors." *Id.* at 387.

The agency also retains "great discretion in determining the scope of an evaluation factor." *Forestry Survs. & Data v. United States*, 44 Fed. Cl. 493, 499 (1999). "When weighing the merits of a proposal under a specific evaluation factor, an agency 'may consider all matters that offerors would reasonably have believed to be within the scope of the factor.'" *Id.* at 497. That said, while the arbitrary and capricious standard calls for considerable agency deference, "it is not a rubber stamp." *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 742 (2000) (citations omitted).

HealthRev contends that the VA ignored eRev's technical experience for Plaintiff's subcontractor status at the Charleston CMOP. Pl.'s Mot. at 14. According to HealthRev, this constitutes application of an unstated evaluation criterion because "nothing in the RFP states that every MPJV member of an offeror must meet the Experience Subfactor requirements while serving as a prime contractor." *Id.* The Court disagrees.

There is no evidence that the VA used the prime or subcontractor status as an unstated evaluation criterion. Rather, any mentions of eRevs' or DLH's titles are part of the broader analysis on whether eRevs and DLH can, in the aggregate, successfully meet the expressly stated non-price requirements. For example, for the Program Management subfactor, the agency required offerors to demonstrate their ability to oversee a large workforce and manage human-resource related, attendance, productivity, quality standards, and supervision issues. AR 274. The VA may thus consider title changes, as subcontractors naturally serve more limited roles than those called for in the solicitation—a matter "that offerors would reasonably have believed to be within the scope" of the Program Management subfactor. *Forestry Survs.*, 44 Fed. Cl. at 497.

Nor did the VA assign HealthRev a weakness under Program Management simply because eRevs previously worked as a subcontractor. Rather, the agency concluded that eRevs' prior responsibilities as DLH's subcontractor did not overlap with the solicitation's requirements. AR 2301 ("[A]ll the identified role/responsibilities . . . appear to demonstrate E-Revs [sic] is serving in [a] more limited role—commensurate with a subcontractor—and does not demonstrate additional capability or expertise outside of that provided by DLH [in the incumbent Charleston CMOP]."). And again, DLH could not remedy its partner's shortcomings because it would not have had lead responsibilities in this contract. *Supra* Section IV(A)(1)(b). The record shows

that the VA considered eRevs' and DLH's past management experiences in relation to the solicitation's requirement and found that, *in totality*, the MPJV was lacking.

### D.   The VA Did Not Subject HealthRev to Disparate Treatment.

To prove disparate treatment, a protestor must show that an agency "unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals" or "inconsistently applied objective solicitation requirements between it and other offerors." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (citations omitted).  HealthRev claims that the VA disparately evaluated its proposal under two categories: Plaintiff's transition plans and under the Past Performance Factor.  Both arguments fail.

### 1.   The VA Did Not Disparately Evaluate HealthRev's and Ansible's Transition Plans.

Plaintiff argues that the VA disparately evaluated HealthRev's and Ansible's transition proposals by preferring Ansible despite the plans being substantively identical.  Pl.'s Mot. at 17. Specifically, HealthRev argues that the proposals had four identical aspects: 1) a [***]-day transition period; 2) proactive recruitment; 3) robust recruitment strategy; and 4) proactive recruitment of incumbent facility administrators.[3]  Pl.'s Mot. at 17–21.  To HealthRev, "[m]any of the alleged Strengths in Ansible's proposal are either explicitly or implicitly included in HealthRev's proposal."  Pl.'s Mot. at 17.  The Court disagrees.

HealthRev insists that the VA arbitrarily ignored the transition advantages from DLH's incumbency.  Pl.'s Reply at 20.  Plaintiff is correct that the VA need not "ignore the benefits or advantages derived from an offeror's incumbency."  *Samsara Inc. v. United States*, 169 Fed. Cl. 311, 322 (2024); *ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 203 (2007) ("[T]he government need not forego the benefits of incumbency in ensuring a level playing field.").  But the Court "may not award 'extra credit' for incumbency where, as here, the solicitation does not require it."  *Sys. Studs. & Simulation, Inc. v. United States*, 152 Fed. Cl. 74, 88 (2020), *aff'd*, 22 F.4th 994 (Fed. Cir. 2021), and *aff'd*, 22 F.4th 994 (Fed. Cir. 2021); *see also Integrated Fin. & Acct. Sols., LLC v. United States*, 161 Fed. Cl. 475, 492 (2022).

Here, the VA did not ignore the advantages of DLH's experience as the incumbent.  *See, e.g.*, AR 2302 (noting that DLH has "significant resources to transition before the required 90 days which reduces the risk of untimely transition").  But HealthRev was the proposed offeror, not DLH.  Plaintiff contends that because DLH is the incumbent currently performing at the Chelmsford CMOP, HealthRev could "provide, on Day One of the contract, *the same strong team* that is currently on-site meeting and exceeding production requirements."  Pl.'s Mot. at 15 (emphasis added); *see also* Pl.'s Mot. at 18 ("HealthRev *includes* the incumbent, so there is zero

---

[3]   To the extent that Plaintiff argues the "too close at hand" doctrine should apply to the VA's transition evaluation, the argument is waived because HealthRev did not raise it in the primary brief.  Pl.'s Reply at 18; *see United States v. Ford Motor Co.*, 463 F.3d 1267, 1276 (Fed. Cir. 2006) ("Arguments raised for the first time in a reply brief are not properly before this court."); *Nova Grp./Tutor-Saliba v. United States*, 87 F.4th 1375, 1381 n.3 (Fed. Cir. 2023).

risk that HealthRev will not possess incumbent support.") (emphasis added).  The record does not support this claim, and by failing to address the differences between HealthRev versus DLH acting as the proposed offeror, Plaintiff's proposal reasonably suffered.

### a.   [***]-Day Transition

First, HealthRev argues that the VA improperly assigned Ansible a strength for a [***]-day transition plan while concluding that Plaintiff's [***]-day plan was "very aggressive" and did "not appear to be feasible."  AR 2302; *see also* Pl.'s Mot. at 17.  To Plaintiff, its [***]-day plan was substantively at least the same, if not more detailed than Ansible's.  Yet the record shows that the VA properly identified ambiguities and unsupported conclusions in HealthRev's proposal.  For instance, its transition timeline included a plan to "[t]ransfer 51% of DLH CMOP employees to eRevs" without any further explanation.  AR 1806.  The agency noted this shortfall in its evaluation.  AR 2302.  HealthRev disagrees that Ansible's [***]-day plan was detailed, but the record shows that Ansible's timetable included narrative explanations in addition to the timetable.  AR 1461–63.

Plaintiff seems to argue that the VA erred by assuming that DLH transitioning to HealthRev would be "fundamentally more difficult" than DLH transitioning to Ansible.  Pl.'s Mot. at 22.  But the VA did recognize that Ansible's transition period would pose a challenge for less experienced contractors.  AR 2287, 2351.  However, the agency ultimately concluded that Ansible could deliver on this timeline as it provided several examples of successfully transitioning other contracts on a [***]-day timeline.  AR 2351 ("It is noted that [***] days is a very aggressive timeline; however, Ansible's proposal provided numerous examples (14 federal contracts, including 4 from VA) where Ansible was able to successfully transition prior contracts while retaining incumbent staff . . . includ[ing] a detailed milestone timeline that further demonstrated feasibility of this [***] day transition.").  HealthRev's experience, in comparison, was limited in scale and scope, which did not mitigate the VA's doubts.  *See id.*

In fact, the VA assigned HealthRev a weakness under the transition subfactor for this reason.  Substantively, the agency concluded that neither eRevs, DLH, or HealthRev provided examples of a full transition, and that DLH's examples occurred "more than 10 years ago" and thus "had very little impact."  AR 2302.  HealthRev claims that this fact is actually a strength and should have been assessed as such: "HealthRev's VA-related transitions are from over ten years ago because DLH has been performing all CMOP contracts for more than ten years and, thus, has not had to transition-in under a CMOP contract for over a decade.  DLH is firmly entrenched in the CMOP program."  Pl.'s Mot at 22.

HealthRev's assumptions based on DLH's continuation of performance are reasonable.  But the solicitation did not limit transition experiences to CMOP contracts.  AR 273–74.  Much like HealthRev's decision to assign eRevs management tasks despite its lack of experience, *supra* Section IV(A)(1)(b), it chose the riskier [***]-day transition timeline that would rationally require a more stringent showing of feasibility.  Likewise, Plaintiff chose to focus its proposal on DLH's older CMOP contracts rather than provide transition examples in other, more recent, federal contracts.  HealthRev may subjectively believe that its proposal deserves superlative ratings, but this disagreement is not enough to sustain a protest.  *Gritter Francona, Inc.*, 158 Fed. Cl. at 608.

16

### b.  Proactive and Robust Recruitment

Ansible also received a strength because its proposal showed that it "has been proactively recruiting and pre-screening for the Chelmsford CMOP."  AR 2287.  HealthRev claims it should have been awarded the same strength because it was "implicit" that it would not need to recruit for the Chelmsford CMOP.  Pl.'s Mot. at 19.  But HealthRev was indeed assigned a strength for having "a considerable number of employees" currently on staff, within fifty miles of the Chelmsford location, and currently supporting the Chelmsford CMOP.   AR 2350 (noting that Ansible was assigned a "similar strength" as HealthRev).

Plaintiff also claims that there is a "virtually complete overlap between HealthRev's and Ansible's recruitment strategies."  Pl.'s Mot. at 20.  Therefore, to HealthRev, it should have received a strength as Ansible did.  *Id.* (comparing HealthRev's and Ansible's strategies including [***]); *see also* AR 1469, 1769, 1808–11.  Yet HealthRev disregards other benefits Ansible offered, including giving every recruited pharmacist and pharmacy technician [***].  AR 1463, 1468.  Ansible also provided every employee a 401k plan with a [***] employer match, a [***], and a [***] for Facility Administrators.  AR 1468.  These substantive differences from Plaintiff's proposal warranted different scores.

### c.  Proactive Recruitment of Incumbent Facility Administrators

Next, the VA assigned Ansible a strength for demonstrating proactive recruitment of incumbent Facility Administrators, "including offering targeted incentives [such as] a [***]."  AR 2288 (offering a [***], a 401(k) with a [***] match, [***] contributions, annual [***] allowances), 1328–29 (offering a [***] health insurance plan with [***] and [***], and "other management perks"), 1463 (same).  The VA also recognized that at the time of the procurement, DLH employed the current Facility Administrator and assigned HealthRev a strength under the Program Management (rather than Transition) subfactor.  AR 2300.

Despite these substantive factors favoring Ansible, HealthRev suggests that the VA was not precluded "from considering an element of a proposal under more than one evaluation criterion."  Pl.'s Reply at 19.  That said, Ansible had ongoing discussions with the incumbent Facility Administrator regarding a proposed benefits package.  *See* AR 1463 ("Her response that she provided in writing was that it sounded 'great,' and we seemed like 'an excellent organization.'").  HealthRev did not clarify whether the incumbent Facility Administrator declined the opportunity to leave DLH or HealthRev's employment if Ansible was awarded the contract.  Pl.'s Mot. at 21.

 Plaintiff's argument is unpersuasive.  "The onus [is] on [HealthRev] to 'submit a well-written proposal with adequately detailed information[.]'"  *Garrett Elecs.*, 163 Fed. Cl. at 670.  HealthRev repeatedly asserts that it possesses "implicit" and "self-evident" advantages.  Pl.'s Reply at 19–20.  But even if DLH's incumbency lends HealthRev certain advantages, it is Plaintiff's burden to present those benefits convincingly to the agency.  It did not do so.

### 2.  The VA Did Not Disparately Evaluate HealthRev's and Ansible's Proposals Under the Past Performance Factor.

Along with its allegations of § 125.8(e) violations, HealthRev contends that the VA disparately evaluated HealthRev under the Past Performance factor.  Plaintiff identifies three

ways the VA purportedly erred: 1) rating DLH's incumbent CMOP contracts as "Relevant" rather than "Very Relevant"; 2) discounting eRevs' experience on the Charleston CMOP; and 3) by discussing nine other contracts performed by DLH that NCO 15 personally awarded.  Pl.'s Mot. at 24–28.  However, the record does not support HealthRev's claim of disparate treatment.

### a. DLH's CMOP Contracts

DLH submitted two projects: its Chelmsford CMOP Pharmacist and Pharmacy Technician Support Services Task Order ("Chelmsford Pharmacist and Pharmacy Technician Task Order") and its Tucson CMOP Shipper/Packer Services Task Order ("Tucson Shipper/Packer Task Order").  AR 1836–37, 2326–27.  DLH provides shippers and packers to the Chelmsford CMOP under a separate contract, and Plaintiff chose to submit only one of those contracts in its Past Performance proposal.  AR 316–17, 2328.  And when the agency evaluated each project separately, as required by the Solicitation criteria, it also evaluated them individually for relevancy—meaning that on its own, each task order was distinguishable from the procurement and rated as "Relevant."  *See* AR 2306.

HealthRev claims that the agency knew that the Chelmsford Pharmacist and Pharmacy Technician Task Order had a Shipper/Packers counterpart based on personal knowledge.  Pl.'s Mot. at 25.  Still, the agency did not err—the solicitation did not require the agency to consider personal business experience with the offeror.  AR 278 ("The Government *may* evaluate present and past performance information by using data independently obtained from other Government or commercial sources, including . . . personal business experience with the offeror.") (emphasis added).  In the end, HealthRev was responsible for ensuring that its proposal provided context to the Chelmsford Pharmacist and Pharmacy Technician Task Order.  *See Garrett Elecs.*, 163 Fed. Cl. at 670.

The VA also noted that DLH's Chelmsford CMOP contract was distinguishable from the current procurement because it "specifically discussed managerial responsibilities, but with respect to staffing focused on maintaining current staffing levels rather than any recruiting, credentialing and onboarding responsibilities."  AR 2327.  While HealthRev found this comparison "disingenuous," as Ansible notes, the Solicitation allows the agency to consider the role DLH has in the joint venture in comparison to its role when it served as the incumbent.  *See* AR 156; Pl.'s Mot. at 26; Def.-Intervenor's Reply at 15.  The Court agrees.  Plaintiff has failed to show that the agency disparately evaluated DLH's submitted contracts.

### b. eRevs' Charleston CMOP Contract

eRevs submitted three projects, two for which it served as a subcontractor to DLH.  AR 2328–40.  In the first project eRevs completed with DLH, it provided Shipper/Packer services at the Charleston CMOP.  AR 1839.  The second was for Pharmacy Technician services at the Charleston CMOP.  AR 1845.

Plaintiff contends that the VA devalued eRevs' Charleston CMOP contracts because it did not directly staff pharmacists, pharmacy technicians, or health care staff.  AR 2329; Pl.'s Mot. at 26–27.  As a result, eRevs' Charleston CMOP contract was rated "Somewhat Relevant."  AR 2329.  HealthRev asserts that the agency knew that this contract "completes the staffing equation necessary for the Charleston CMOP operation—which is fully met by eRevs and DLH."  Pl.'s Mot. at 26–27.

The VA did not share HealthRev's certainty. HealthRev believed it was obvious that DLH could provide a full complement of CMOP personnel because DLH was the incumbent contractor. The Solicitation allowed HealthRev to provide "rationale supporting the assertion of relevance and how it was determined that the work performed previously was the same or similar in size, scope, and complexity to the work specified by this solicitation." AR 156. It did not. *See* AR 1840 (including HealthRev's four-paragraph explanation for the relevancy of eRevs' subcontract, which does not state that DLH—instead of eRevs—would be responsible for full staffing). The problem lies with how HealthRev wrote its proposal, not with the agency's evaluation. *Garrett Elecs.*, 163 Fed. Cl. at 670.

Additionally, the evidence shows that DLH previously struggled to provide personnel and meet requested staffing levels: "there are ongoing issues with DLH meeting the required staffing levels set forth in the contracts, which has required specific additional governmental intervention in the form of weekly meetings." AR 2352. The VA also accounted for concerns with eRevs' past performance. *Id.* [***], *id.* [***]. Thus, the agency did not err in rating eRevs' past CMOP subcontracts as "relevant" rather than "very relevant."

### c. DLH's Other Contracts with NCO

Finally, HealthRev argues that the VA "inappropriately scrutinized HealthRev's contracts unlike any other offeror's." Pl.'s Mot. at 28. Plaintiff claims that the VA discussed nine contracts NCO 15 awarded to DLH, most older than three years, which was barred by the Solicitation. *Id.* at 29; AR 2332. It also argues that the VA improperly relied on a March 21, 2023 Letter of Concern ("LOC") that "articulated performance issues" under DLH's recent contracts. Pl.'s Mot. at 30; *see* AR 2333.

While the agency mentioned nine contracts, including those dating back to May 2012, these contracts were referenced briefly, as initial background. *See* AR 2332. The VA only considered performance issues within the last three years. *See* AR 2327 (discussing issues in April 2023 on a follow-on task order), 2328 (addressing same for the March 2023 to October 2023 DLH Shipper/Packers task order). Thus, the agency complied with the Solicitation's terms.

Plaintiff also asserts that the VA improperly considered these performance issues. According to HealthRev, the agency "cannot credibly rely on alleged staffing and other performance problems [in other DLH contracts NCO 15 administered] . . . because the VA has rated DLH's CMOP contracts performance, including at Chelmsford, at least 'Satisfactory.'" Pl.'s Mot. at 28–29. The record shows otherwise. The agency reserved the right to use "data independently obtained from other Government or commercial sources," including these contracts NCO 15 "personally awarded and/or administered" to DLH. AR 159; *see also* AR 2332 (finding that DLH's overall performance was "Satisfactory, however, there were performance problems noted, including recent issues").

HealthRev also challenges the agency's reliance on the LOC addressing DLH's performance issues. The letter identified [***]. AR 2333. The VA could have reasonably concluded that the mere issuance of a LOC was problematic. But the agency articulated multiple additional concerns about DLH's performance including "a need to establish weekly meetings with the Government." AR 2606; *see also* 2333 (recognizing that while DLH's past performance was "Satisfactory," "these ongoing issues preclude a high expectation the offeror will successfully perform"), 2333 ("VA files noted [***]."), 2329 [***], 2329 (stating that these

issues needed to be addressed "by the Government at regular meetings and performance issues were recorded"), 2351–52 ("While the specific contracts submitted did have good performance, NCO 15 files demonstrate ongoing performance issues with respect to [***].  Specifically, there are ongoing issues with DLH [***].").

Thus, the agency's decisional path is both reasonably justified and discerned. Accordingly, the Court will not disturb its evaluation.

### E.      HealthRev Is Not Entitled to Injunctive Relief.

To warrant permanent injunctive relief, a plaintiff must establish each of four factors:

(1)  whether, as it must, the plaintiff has succeeded on the merits of the case;

(2)  whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief;

(3)  whether the balance of hardships to the respective parties favors the grant of injunctive relief; and

(4)  whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (citations omitted). Because "proving success on the merits is a necessary element for a permanent injunction," the Court denies HealthRev's request for injunctive relief.  *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018); *Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1384 n.7 (Fed. Cir. 2022) ("Because we conclude that [plaintiff] has not shown success on the merits, we need not address its claim of irreparable injury.").

## V.      Conclusion

For these reasons, Plaintiff's Motion for Judgment on the Administrative Record is **DENIED**.  Defendant and Defendant-Intervenor's Cross-Motions for Judgment on the Administrative Record are **GRANTED**.  The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

 s/ Carolyn N. Lerner
CAROLYN N. LERNER
Judge